FILED

2011 Dec-08  AM 10:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **RICHARD E. MOBLEY,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **2:10-CV-2649-KOB** |
| | ] | |
| **BANCTEC, INC.,** | ] | |
| | ] | |
| **Defendant.** | ] | |
| | ] | |

## MEMORANDUM OPINION

This matter comes before the court on Defendant BancTec's Motion for Summary Judgment (doc. 18).  The parties have fully briefed the motion. The court has considered the submissions and the applicable law, and issued an order stating its findings on the issues raised in this motion on November 17, 2011 (doc. 26), which the court now explains in this memorandum opinion.  For the reasons stated below, the court GRANTS the motion IN PART as to the breach of contract claim, but DENIES the motion IN PART as to the fraud claim.

## I. INTRODUCTION

Plaintiff Richard Mobley initiated this suit against BancTec, his former and most recent employer, alleging breach of his employment contract and fraud for alleged misrepresentations made when negotiating the new employment contract. BancTec moved for summary judgment on both counts.

## II. STATEMENT OF FACTS

In a motion for summary judgment, the facts are construed in the light most favorable to

1

the non-movant. Thus, any factual disputes will be resolved in Mr. Mobley's favor.

Before beginning his employment with BancTec, Mr. Mobley worked for approximately twenty-five years in healthcare-related software service and technologies. He worked for several different companies, and around 2001 began working for VitalWorks as the vice president of Electronic Data Information (EDI) services, where he estimated his salary was $150,000 annually with a bonus plan and stock options. According to Mr. Mobley, EDI services provided solutions to facilitate the movement of transactions between different trading partners in the healthcare industry, for example, between medical insurance companies and physicians. While he worked at VitalWorks, Mr. Mobley's typical customers were small physician groups.

VitalWorks, which had its corporate headquarters in Connecticut, was later acquired by Cerner Corporation, a corporation based in Kansas City, Missouri. Mr. Mobley's base salary and job responsibilities did not, in general, change with the acquisition. Cerner was Mr. Mobley's employer immediately before he started working at BancTec. While at VitalWorks, Mr. Mobley's division started with no revenue, but eventually earned $18-20 million while Mr. Mobley was the vice president of the division. When Mr. Mobley's division became a part of Cerner, the revenues of his division increased to $28-34 million.

Mr. Mobley encountered BancTec in 2006 while working for Cerner. Cerner had been looking for a technological solution to handle paper remittances to physicians' offices and Mr. Mobley came across BancTec as a potential provider of that technology. BancTec,[1] which originally started out servicing banks, sought to service the healthcare field by providing

---

[1] According to Mr. Mobley, BancTec's business "grew up" manufacturing hardware that banks would use to process checks by scanning the checks and extracting data.

"revenue management lockbox service[s][2] . . . claims processing service[s] . . . and medical record scanning and archival services." *See* Depo. Malcolm Gurney at 16:8–11 (July 27, 2011).

Over the course of approximately one year, Cerner discussed the possibility of purchasing BancTec services, but ultimately rejected BancTec's proposal. According to Mr. Mobley, Cerner did not accept BancTec's proposal because BancTec had no references (i.e., no prior customers with which Cerner could speak) and because the technical people working under Mr. Mobley did not understand how BancTec's product worked. Notwithstanding Cerner's rejection of BancTec's proposal, in 2007 Mr. Mobley began speaking with Jeff Brown, his primary contact at BancTec over the previous year, about possibly working for BancTec. These discussions later materialized into an offer of employment, and Mr. Mobley started working for BancTec in early 2008.

In his brief, Mr. Mobley focuses extensively on the representations that Mr. Brown made to him during their pre-hire communications. One area that the parties emphasize were representations regarding BancTec's services, referred to as "Revenue Cycle 360 degrees" or "RC360," which appears to be the service that BancTec proposed to Cerner. The parties focus on RC360 because Mr. Mobley believed he was hired to help develop and market RC360, and alleges that he based his decision to work for BancTec in part on representations made about the service.

The RC360 service was supposed to take an imaged file (for example, an image of a

---

[2] Mr. Mobley described a "lockbox" as "a mailroom operated by a bank." *See* Depo. Richard Mobley at 180:12–22 (July 22, 2011). For example, a credit card company might use a lockbox to receive payments from its customers. According to Mr. Mobley, the lockbox would receive the check from the consumer, extract data from the check, and send that data to the credit card company. Mr. Mobley admitted that this explanation was an oversimplification of the lockbox process.

check), extract the appropriate data from that image, reformat that data into a computer file that a client's billing system could read, and transfer that data to the client. For example, if a physician chose to have her office process financial transactions electronically, she could have an insurance company send the check for a payment of claim and the Explanation of Benefits[3] ("EOB") to a bank lockbox, which would take the check and EOB and convert it into a computer image file. The RC360 service would then extract the relevant data and send it to the physician in a format she could use for her billing software. The physician's office could thus manage billing and post payments without having to handle as much paper as it would otherwise.

According to Malcolm Gurney, president of BancTec Canada and BancTec's Rule 30(b)(6) representative, BancTec created the original business plan for RC360 in 2007, with primary development completed around April, 2008. Mr. Mobley stated that BancTec's initial strategy was to have its established bank clients resell the BancTec healthcare services to the bank's clients, including the RC360 service. Mr. Mobley believed that Mr. Brown and others at BancTec recognized that this sales strategy was flawed, and that they hired Mr. Mobley because "they needed a healthcare industry person who could roll into a doctor's office and speak the language and be respected." *See* Depo. Richard Mobley at 165:20–166:7 (July 22, 2011).

The parties dispute the representations Mr. Brown made to Mr. Mobley regarding the accuracy of the RC360 service, also known as its "capture rate."[4] According to Mr. Mobley, Mr.

---

[3] The parties did not define the term "EOB" in their briefs, nor did the deponents define the term when used in deposition. Wikipedia defines the term as "a statement sent by a health insurance company to covered individuals explaining what medical treatment and/or services were paid for on their behalf."

[4] Mr. Mobley offers inconsistent definitions for the term "capture rate." At one point, he said that the capture rate refers to the percentage of the number of characters on a page that are captured accurately by the scanner. *See* Depo. Richard Mobley at 230:13–17 (July 22, 2011). In the same deposition, he later affirmed that seventy-five percent capture rate meant that seventy-five percent of the EOBs were captured. *See* Depo. Richard Mobley at 263:15–264:1 (July 22, 2011).

Brown stated in pre-hire discussions that BancTec "had the best capture mechanism on the market, that they had very little human interaction to try and correct things that didn't capture properly" and that BancTec's software had a "capture rate of seventy-five percent for EOB's [*sic*]." *See* Depo. Richard Mobley at 258:16–22, 262:6–13 (July 22, 2011). Similarly, Mr. Mobley states that Mr. Brown told him that BancTec was manually keying in very little information from the paper EOBs. BancTec attempts to dispute these representations by relying on statements by Mr. Mobley that he could not recall the specifics of recruiting discussions and on Mr. Mobley's statement that he didn't "believe capture rate was guaranteeable." *See* Depo. Richard Mobley at 232:4–5 (July 22, 2011).  Because BancTec is the moving party and has not provided any evidence refuting these claims, however, the court must accept for the purpose of this motion that Mr. Brown made these representations to Mr. Mobley. As to Mr. Mobley's statement that the capture rate was not guaranteeable, this court finds that this statement would only be pertinent in demonstrating the weight that Mr. Mobley gave to Mr. Brown's representations, and not in refuting that Mr. Brown made the representations.

Mr. Mobley alleges other representations that Mr. Brown made to him during the pre-hire discussion regarding the status of BancTec's clients in healthcare services. According to Mr. Mobley, Mr. Brown stated that BancTec had "live" clients that were using BancTec's software to process EOBs (i.e., clients that were using BancTec's software without "hand-holding" by BancTec), and that BancTec had several additional companies that were "inches away" from becoming clients of BancTec. *See* Depo. Richard Mobley at 260:5–261:17.

In addition to these representations regarding the state of BancTec's healthcare services business, Mr. Mobley states that Mr. Brown made several representations regarding Mr.

Mobley's job responsibilities and authority. According to Mr. Mobley, Mr. Brown told him,
during the course of the pre-hire communications, that Mr. Mobley's job responsibilities would
include "[b]uild[ing] a healthcare business, set[ting] budgets, run[ning] the P&L,[5] product
direction, client relations, sales, hiring, account management" and other responsibilities. *See*
Depo. Richard Mobley at 228:15–18 (July 22, 2011). Based on these representations, Mr.
Mobley believed that he would have hiring and firing authority and price setting ability.

These pre-hire communications eventually led to a written offer of employment, dated
March 24, 2008, which Mr. Mobley accepted. According to the offer, Mr. Mobley's start date
was May 1, 2008 and his annual salary was $200,000.00. He was also to have an additional
$100,000.00 the first year as a recoverable draw against commissions he earned, even if he did
not bring in $100,000.00 worth of commissions. This offer referred to other compensation
incentives as well. The last paragraph in this written offer stated that the offer was "not an
employment contract" and that Mr. Mobley's employment was "not for any specific time, and
may be terminated at will, with or without case, and without prior notice by the Company . . . ."
Def. Ex. A-1 at 28.

Mr. Mobley later signed a revised offer letter, dated April 2, 2008, which also stated that
his employment was at-will. Mr. Mobley signed other documents indicating that he was an at-
will employee, including an agreement authorizing wage deductions and a confidentiality and
assignment of inventions agreement. He also accepted a 2009 Sales Commission Plan, which
provided a sales quota of $15 million for "total contract value" (TCV). The Sales Commission

---

[5] "P&L" refers to "profit and loss." When Mr. Brown told Mr. Mobley that he would "own" the P&L, this meant, to
Mr. Mobley, that he would be "setting an annual budget for revenue and expenses and administering those expenses
to perform [BancTec's] business plan." Depo. Richard Mobley 233:8–11 (July 22, 2011).

Plan, although it did not refer to Mr. Mobley as an at-will employee, stated that "BancTec may terminate the employment of any Participant covered by this Plan, with or without notice, and with or without cause." Def. Ex. A-1 at 10.

When Mr. Mobley started at BancTec, Mr. Brown announced his arrival with an e-mail acknowledging Mr. Mobley's accomplishments at Cerner and his status as an "industry heavy weight [*sic*] in healthcare Revenue Cycle Management." In that same e-mail, Mr. Brown declared that "[i]n [Mr. Mobley's] new role at BancTec, [he] will set the direction, operate and grow the emerging healthcare [business process outsourcing] business for BancTec, focusing initially On [*sic*] healthcare payment and healthcare claims processing. He will own the P&L, the account relationships, sales and support and will be responsible to the customer for the services contracted." *See* Pl. Ex. 1.

As Mr. Mobley began working for BancTec, however, the relationship between the parties soured, ending with Mr. Mobley's termination in April, 2010. Shortly after he began working at BancTec, Mr. Mobley realized that he did not own the P&L. He did not have authority to make expenditures, his revenue goals were handed down to him, he had no hiring or firing authority, and he had no price setting authority. Mr. Mobley also claims that before signing the 2009 Sales Commission Plan, Mr. Brown had told him he would only have a sales quota of $5 million, which Mr. Brown later tripled to $15 million.

Once Mr. Mobley started developing a project plan for RC360 in July or August, 2008, he also discovered that the RC360 service was not as effective as Mr. Brown allegedly represented. The RC360 software, according to Mr. Mobley, failed to extract appropriate data from an image seventy-five to eighty percent of the time, requiring a BancTec data entry person to key most of

the data in manually. Mr. Mobley's realization that the RC360 service "was broken" prompted him to advocate hiring a consultant to do a "gap analysis," which would demonstrate the difference between what the RC360 service could actually do as it existed at that time, and what it needed to do to meet clients needs.  As part of the project planning, Mr. Mobley also created a development roadmap for how to make the RC360 service workable such that it would meet the needs of the market. *See* Depo. Richard Mobley at 147:2–8, 166:16–20 (July 22, 2011).

 Mr. Mobley also discovered that BancTec had no "live" clients who were implementing and using the RC360 service effectively without intervention from BancTec, contrary to Mr. Brown's statements in the pre-hire discussion. In at least one case, a client, TD Bank, which used BancTec's RC360 service and resold it to a hospital client, appeared to have cancelled the service. TD Bank's cancellation of the service occurred around May, 2009, and happened because, according to Mr. Mobley, the service was unreliable.

Mr. Mobley, however, had begun communicating his concerns about the ineffectiveness of BancTec's products far earlier than the date TD Bank cancelled the service. According to Mr. Mobley, he raised his concerns about the deficiencies in the RC360 service to Mr. Brown in late 2008. In response, Mr. Brown told Mr. Mobley that he was not to worry about having a working product, but that he should instead worry about selling the product. On November 21, 2008 Mr. Brown communicated to Mr. Mobley his disappointment that Mr. Mobley had not grown any meaningful prospects. When Mr. Mobley responded he was "selling out of an empty truck" because he had no working solution to sell and no references on the RC360 service, Mr. Brown responded that he had been selling out of an empty truck for thirty years and that "yu [*sic*] guys need to get moving." *See* Def. Ex. A-1 at 68.

8

Mr. Mobley alleges that BancTec nevertheless did little to improve its product. On June 30, 2009, BancTec approved $250,000 of capital to "enhance" RC360. *See* Pl. Ex. 4. BancTec only spent $60,000-$70,000 of that amount, but did spend $38,000 on the consultant that Mr. Mobley advocated to perform the gap analysis. As part of the gap analysis, the consultant expressed concern about the reliability underlying the RC360 service. Notwithstanding these concerns, Mr. Mobley claims that BancTec never implemented the consultant's design,[6] and that up to the day he was terminated he was not given a workable product to sell.

While Mr. Mobley had become frustrated with the unreliability of the product BancTec had tasked him with selling, BancTec also was unsatisfied with Mr. Mobley's performance. As early as November, 2008, Mr. Brown had begun communicating to Mr. Mobley his disappointment with Mr. Mobley's lack of sales. Throughout 2009 Mr. Mobley did not close any new sales. Although Mr. Mobley did receive a bonus in 2009 based on corporate performance,[7] he received no credit for his "Leadership Incentive Program" objective of "clos[ing] at least one major healthcare customer in 2009 that will create planned 2010 revenues as documented in the Healthcare Business Plan." *See* Def. Ex. A- 4.

BancTec expressed its dissatisfaction with Mr. Mobley in a February 2010 performance appraisal, which rated Mr. Mobley below the "meets expectations" level in several categories. The comments at the end of the performance appraisal specifically informed Mr. Mobley that he "had a disappointing year . . . as the head of the BPO Healthcare practice," that "[n]o new sales

---

[6] According to Mr. Gurney, BancTec never implemented some of the consultant's recommendations because BancTec did not have any clients demanding that functionality.

[7] For example, Mr. Mobley received partial credit on "coordinat[ing] and support[ing] the BancTec BPO sales efforts of Docudata and other BPO sales team in executing the 5 year Health Care Plan." *See* Def. Ex. A-4.

were realized in BPO healthcare," and that "[Mr. Mobley] needs to close a deal of significant scale in early 2010 if he is to maintain his position as head of the practice and/or remain as a BancTec employee." *See* Def. Ex. A-3. Mr. Mobley did not close a deal of significant scale in 2010. In April, 2010, BancTec's president, with input from Mr. Brown and another BancTec employee, decided to terminate Mr. Mobley. BancTec's reason for terminating Mr. Mobley was non-performance for failing to bring in any new accounts.

## III. STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure. Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. When a district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.*

10

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)  In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a *genuine issue for trial.*'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (emphasis added); *see also* Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e), 28 U.S.C. app. ("The very mission of summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.").  The moving party need not present evidence in a form admissible at trial; "however, he may not merely rest on [the] pleadings." *Celotex*, 477 U.S. at 324.  If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50 (citations omitted).

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir.

11

1988).  The court must refrain from weighing the evidence and making credibility

determinations, because these decisions fall to the province of the jury.  *See Anderson*, 477 U.S.

at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v.

State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).

      Furthermore, all evidence and inferences drawn from the underlying facts must be viewed

in the light most favorable to the non-moving party.  *Graham*, 193 F.3d at 1282.  The non-

moving party "need not be given the benefit of every inference but only of every reasonable

inference."  *Id.*  The evidence of the non-moving party "is to be believed and all justifiable

inferences are to be drawn in [its] favor."  *Anderson*, 477 U.S. at 255.  After both parties have

addressed the motion for summary judgment, the court must grant the motion *if* no genuine

issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56.

## IV. DISCUSSION

*A. Mr. Mobley's Breach of Contract Claim*

      The first count Mr. Mobley asserted in his complaint was for breach of contract. In

defense, BancTec asserts that Mr. Mobley was an employee at-will, based both on the terms of

offer of employment and on the common law presumption that employment relationships are at-

will, and that accordingly, BancTec was free to terminate Mr. Mobley with or without cause.

      "Alabama has a well established 'employment-at-will' doctrine, under which an employer

may terminate an employee at its discretion, if no provision in the employment contract provides

for a specific term of employment or sets forth terms and conditions for dismissal." *Ex Parte

Betty Gardner*, 822 So. 2d 1211, 1217 (Ala. 2001) (internal quotations omitted). Thus, in

Alabama, an employee contract at-will may be terminated by either party without cause or justification. *See Hoffman-La Roche*, *Inc. v. Campbell*, 512 So. 2d 725, 728 (Ala. 1987). "This means a *good* reason, a *wrong* reason, or *no* reason." *Id.* (emphasis in original).

To establish that an employment contract is one other than at-will, the plaintiff must show three elements: "(1) that there was a clear and unequivocal offer of lifetime employment or employment of [a] definite duration . . .; (2) that the hiring agent had authority to bind the principal to a permanent employment contract . . .; *and* (3) that the employee provided substantial consideration for the contract separate from the services rendered." *Ex parte Michelin N.A.*, *Inc.*, 795 So. 2d 674, 677–78 (Ala. 2001) (internal citations omitted). The Alabama Supreme Court has also recognized "the possibility that an employee handbook may form a contract that converts an at-will employment relationship into one in which the employer's right to terminate the employment is limited." *See Ex parte Michelin*, 795 So. 2d at 677 n. 3 (citing *Hoffman v. La-Roche*, 512 So. 2d at 735).

In this case, Mr. Mobley has not established that the employment offer is one other than at-will. Nothing in the written employment offer or in the pre-hire discussions that took place between Mr. Mobley and Mr. Brown indicate a "clear and unequivocal offer of lifetime employment or employment of [a] definite duration." *See Michelin*, 795 So. 2d a 677. To the contrary, several different documents he signed when accepting employment explicitly stated his status as an at-will employee. Mr. Mobley has not offered an employee handbook, nor has he provided any authority indicating that he meets some other exception to the employee-at-will doctrine.

Mr. Mobley does cite to *Scott v. Lane*, 409 So. 2d 791 (Ala. 1982), for the proposition

that in Alabama "if the hirer knows that the person being employed then has employment, and that he is giving it up to engage in his new work under the new contract, a valuable consideration is shown." *See Scott*, 409 So. 2d at 794 (quoting *Alabama Mills*, *Inc. v. Smith*, 237 Ala. 296, 186 So. 699 (1939)).  Mr. Mobley argues that BancTec's knowledge that Mr. Mobley was leaving his job at Cerner to work for BancTec takes his employment "out of the employment-at-will posture," *see* Pl. Opp. Br. at 23. The statement from *Scott*, however, does not support this position. Instead, *Scott* made clear that a binding contract exists when an employee, as valuable consideration, gives up his former employment in exchange for an offer of *permanent employment*. Permanent employment is the condition that takes an employment out of the employment-at-will posture, and giving up former employment is the *consideration* that makes a permanent employment contract binding and enforceable.

Mr. Mobley does not argue in his brief that he was a permanent employee. Had he done so, however, he would not have succeeded. In Alabama, permanent employment "is defined as employment that is guaranteed so long as the employer is engaged in the same kind of business and needs the service of the employee performing it and the employee is able and willing to perform the job satisfactorily and gives no cause for his discharge." *See Aldridge v. DaimlerChrysler Corp.*, 809 So. 2d 785, 793 (Ala. 2001) (citing *Alabama Mills*, 186 So. at 701). Nothing in the facts indicates that BancTec had guaranteed Mr. Mobley's employment or that it needed his services at the time it terminated him.

Accordingly, because Mr. Mobley was an at-will employee, he cannot maintain his breach of contract claim as a matter of law, and this claim is hereby DISMISSED WITH PREJUDICE. *See Ex Parte Michelin*, 795 So. 2d at 678 (affirming summary judgment on a

14

breach of contract claim after determining that the employee was employed at-will).

*B. Mr. Mobley's Fraud Claim*

Mr. Mobley asserts a fraud claim against BancTec for misrepresenting facts related to his employment during the pre-hire discussions. To prevail on his fraud claim, Mr. Mobley must prove: (1) BancTec made false representations; (2) of a material existing fact; (3) that Mr. Mobley reasonably relied upon; and (4) that Mr. Mobley suffered damage as a proximate cause of the representations. *See S.B. v. St. James School*, 959 So. 2d 72, 101 (Ala. 2006) (citing *Padgett v. Hughes*, 535 So. 2d 140, 142 (Ala. 1988)).

In this case, Mr. Mobley identifies the false representations as Mr. Brown's representations on behalf of BancTec (1) that the RC360 service had a seventy-five percent capture rate, (2) that Mr. Mobley would own the P&L, (3) that BancTec had at least two "live" clients, and (4) that several additional companies were inches away from becoming clients. From the outset, this court notes that the alleged false representation that Mr. Mobley would own the P&L was not a material existing fact, but rather a promise to act in the future. Although Mr. Mobley did not plead promissory fraud, which is based on a promise to act in the future, Alabama law would require him to prove two additional elements to sustain a promissory fraud claim: (5) proof that at the time of the misrepresentation, BancTec had the intention to not perform the act promised, and (6) proof that BancTec intended to deceive him. *See Padgett v. Huges*, 535 So. 2d 140, 142 (Ala. 1988).

Mr. Brown's misrepresentation of the capture rate

Viewing the facts in the light most favorable to Mr. Mobley, this court must accept that Mr. Brown told Mr. Mobley that the RC360 technology had a capture rate of at least seventy-five

percent. This court must also accept that, while Mr. Mobley was working for BancTec, the RC360 technology failed seventy-five to eighty-five percent of the time. Thus, Mr. Brown made a false representation of an existing fact to Mr. Mobley.

A reasonably jury could also find that, under the facts, the misrepresentation was material. "A material fact is one which would induce the plaintiff to take action." *Lawson v. Cagle*, 504 So. 2d 226, 227 (Ala. 1987). In this case, the RC360 service was closely tied to Mr. Mobley's area of expertise, and was the basis for the BancTec services that Mr. Brown tasked Mr. Mobley to sell. Thus, enough evidence exists to demonstrate that the effectiveness of the RC360 service was a fact that would induce Mr. Mobley to take employment with BancTec.

Whether Mr. Mobley reasonably relied on Mr. Brown's misrepresentations, the third element of a fraud claim, is a much closer issue than the previous two elements. Under Alabama law, "[Mr. Mobley] must show not only that he relied on [Mr. Brown]'s alleged misrepresentation, but also that his reliance was *reasonable* in light of the facts surrounding [the employment discussions]." *See AmerUS Life Ins. Co. v. Smith*, 5 So. 3d 1200, 1208 (Ala. 2008) (emphasis in original). The Alabama Supreme Court has further instructed that the "reasonable reliance" standard should take into account all the circumstances surrounding a transaction, including "the mental capacity, educational background, relative sophistication, and bargaining power of the parties." *See AmerUS Life Ins. Co.*, 5 So. 3d at 1207–08 (quoting *Foremost Ins. Co. v. Parham*, 693 So. 2d 409 (1997)).

Although the holding in *AmerUS Life Insurance* arose in a factual context where the plaintiff had documents explaining insurance policies that an insurance agent allegedly misrepresented, the principles derived from that case go beyond the duty to read a document. The

16

Alabama Supreme Court stated that "[f]raud is deemed to have been discovered when the person either actually discovered, or when the person ought to or should have discovered, facts which would provoke inquiry by a person of ordinary prudence, and, by simple investigation of the facts, the fraud would have been uncovered." *See AmerUS Life Ins. Co.*, 5 So. 3d at 1208 (quoting *Gonzales v. U-J Chevrolet Co.*, 451 So. 2d 244, 247 (Ala. 1984)).

In light of this case, the court agrees with BancTec that *some* of Mr. Mobley's admissions in deposition undercut his argument that he reasonably relied on Mr. Brown's misrepresentations regarding the capture rate of the RC360 technology. The very reason Mr. Mobley met Mr. Brown was because Mr. Mobley's department at Cerner was considering using BancTec's services. And the reason why Cerner, acting under Mr. Mobley's leadership, decided to reject BancTec's proposal after months of negotiation was because BancTec had no references and because Mr. Mobley's technical team did not understand the RC360 technology. Mr. Mobley's considerable expertise and sophistication in the field also weigh against his reasonable reliance on Mr. Brown's representations regarding the RC360 technology capture rate.

Mr. Mobley also explained in deposition that "I have sacrificed a lot to come here, you know, I don't mean money because, clearly, I made them pay because I didn't know that it was actually going to work." Whether the "it" Mr. Mobley refers to is the RC360 technology or his employment with BancTec is unclear; but what is clear is that Mr. Mobley appreciated the risk in leaving Cerner to work for BancTec.

This court finds it questionable that Mr. Mobley, given his industry experience and the year he spent evaluating BancTec's product for Cerner, would blindly accept Mr. Brown's estimate on the RC360 technology's capture rate. More plausible is that Mr. Mobley recognized

17

that the technology had problems, because he evaluated it for a year at Cerner, yet still joined BancTec in the hope that BancTec would improve on the RC360 technology. Ultimately, BancTec's failure to turn the RC360 technology into a workable service appears to have been what doomed Mr. Mobley to an inability to make sales.

Nevertheless, this court finds it difficult to grant BancTec summary judgment on fraud regarding the representation of the RC360 technology's capture rate. This case is distinguishable from *AmerUS Life Insurance* because, unlike that case, Mr. Mobley did not have a document in front of him that would have refuted the fraud. BancTec has not shown that he had ready access to the data on the RC360 technology and thus could not have uncovered the fraud with a simple investigation. Moreover, on a motion for summary judgment, this court is not to weigh evidence or make credibility determinations. Even though Mr. Mobley's assertion that he reasonably relied on Mr. Brown's misrepresentations may be questionable, an equally justifiable inference exists that he could have been unaware of the technology's low capture rate, notwithstanding Cerner's rejection of BancTec's proposal under Mr. Mobley's leadership. Thus, this court will accept for purposes of this motion for summary judgment that genuine issues of material fact exist from which a jury could find that Mr. Mobley reasonably relied on BancTec's misrepresentations.

Mr. Mobley must also prove that he suffered damages as a proximate cause of the representations. A reasonable jury could find that Mr. Mobley suffered damages from being induced to leave a job at which he was successful and had more job security, even though BancTec offered him higher pay. Accordingly, this court will accept that Mr. Mobley suffered damages.

The fraud claim is a close issue, but when the facts are viewed in the light most favorable

18

to Mr. Mobley, this court can draw a reasonable inference that BancTec falsely represented the effectiveness of the RC360 technology to Mr. Mobley, that this misrepresentation was a material fact inducing Mr. Mobley to take a position with BancTec, that Mr. Mobley reasonably relied on this fact in leaving Cerner to take his position with BancTec, and that he suffered damages proximately caused by the misrepresentation because he left secure employment. Moreover, the Alabama Supreme Court has held that an employee who gave up former employment to work for another employer based on alleged misrepresentations could maintain an action for fraud, even where the employment was at-will. *See Kidder v. AmSouth*, 639 So. 2d 1361, 1362–63 (Ala. 1994). Accordingly, the court finds that BancTec's motion for summary judgment as it applies to the fraud claim based on the alleged misrepresentation of BancTec's technology is due to be denied.

<u>BancTec's representation of the "live" clients and the additional companies "inches away" from becoming clients</u>

The analysis for the fraud claim based on these representations is similar to that for the representation regarding the RC360 technology's effectiveness. These representations, according to Mr. Mobley, were false. The defendants have not offered evidence to rebut Mr. Mobley's assertions, and so the court must accept them as true. And similar to the misrepresentation on BancTec's technology, a reasonable jury could find that they materially induced Mr. Mobley to leave his employment to work with BancTec.

Because Mr. Mobley did not have a way to verify whether this information was true, he could reasonably rely on the representation. And because the representation induced Mr. Mobley to leave his former employment, where he had a more secure position, he suffered damages as a

proximate cause of the representation. Accordingly, this court finds that BancTec's motion for summary judgment on the fraud claim based on the misrepresentations of the RC360 service's client base is due to be denied.

BancTec's representation that Mr. Mobley would "own" the P&L

Unlike the other representations, this statement was not of a material existing fact, but a promise to act in the future. Neither party raised promissory fraud as an issue in their briefs. Nevertheless, under Alabama law, Mr. Mobley cannot maintain a promissory fraud claim unless, in addition to the other elements above, he also proves that at the time of the misrepresentation, BancTec had the intention not to perform the act promised, and produces proof that the BancTec had an intent to deceive. *See Padgett*, 535 So. 2d at 142 (Ala. 1988).

Mr. Mobley has offered no proof that BancTec did not intend to perform the act promised and that it intended to deceive Mr. Mobley. To the contrary, when Mr. Brown introduced Mr. Mobley to other BancTec employees by e-mail, he stated that Mr. Mobley would "own the P&L." Whether the fact that Mr. Mobley did not "own the P&L" resulted from a miscommunication between Mr. Mobley and Mr. Brown as to what that phrase meant, or whether it was because BancTec simply changed its mind, Mr. Mobley has not submitted nor pointed to any evidence that shows BancTec intended to deceive him. Accordingly, the court finds that Mr. Mobley's fraud claim based in Mr. Brown's promise that he would "own the P&L" is due to be dismissed.

Mr. Mobley's continuing employment after the discovery of the misrepresentations does not preclude his fraud claim

In its brief, BancTec argues by implication that the fact that Mr. Mobley did not leave his

employment after discovering the misrepresentations precludes his fraud claim. BancTec emphasizes Mr. Mobley's admission that he continued to work, even after he learned about the limits on his authority and the unworkability of the RC360 service, because "I mean, they were paying me a lot of money." *See* Depo. Richard Mobley at 162:3–4 (July 22, 2011). BancTec also asserts that Mr. Mobley did not timely file suit, implying that Mr. Mobley's discovery of the misrepresentations constituted the discovery that started the statute of limitations.  BancTec, however, has not provided any authority to support these assertions, beyond suggesting that *AmerUS Life Insurance Co. v. Smith*, 5 So. 3d 1200 (Ala. 2008) precludes reasonable reliance.

This court declines to extend the Alabama case law to preclude reasonable reliance where an employee discovers misrepresentations regarding the circumstances of employment during the course of employment, but nevertheless continues to work for the employer. Continuing to work for an employer does not negate the employee's initial reasonable reliance on the employer's representation made when switching jobs. The act of reasonably relying on the representations was completed at the time Mr. Mobley began working for BancTec, and the case law does not suggest that more is required.

Furthermore, the stance BancTec advocates would put a potential plaintiff who has discovered misrepresentations after beginning employment, but before termination, in a difficult position. The plaintiff would be forced to either gamble on litigating a fraud claim, with the high costs attendant to that litigation and likely termination; or the plaintiff would be forced to forego a potentially valid fraud claim. The court thus refuses to adopt the rule BancTec implies in its arguments, absent any authority from the Alabama state courts.

21

_Kidder_ does not foreclose damages should Mr. Mobley succeed at trial

Finally, BancTec argues in its reply brief that the Alabama Supreme Court's opinion in _Kidder v. AmSouth Bank_, 639 So. 2d 1361, 1363 (Ala. 1994), "forecloses damages for termination of at-will employment, and does not address what damages might be available." Def. Reply Br. at 9 (doc. 23). While both statements are true, BancTec omits that the members of that Court agreed that "[the plaintiff] would be entitled to damages for all injuries caused by the misrepresentation." _See Kidder_, 639 So. 2d at 1363. The Court in _Kidder_ declined to speculate on what those damages might be, _see id._, but it did acknowledge that damages were recoverable. Similarly, this court's denial of summary judgment on the fraud claim is not a statement on the amount of damages. Should Mr. Mobley convince a jury at trial that BancTec committed fraud, he will then have to prove that he suffered damages as a result. A jury may conclude that Mr. Mobley suffered no damages; but the possibility that a jury may do so will not preclude suit, because this court finds that a reasonable jury could likewise conclude that Mr. Mobley suffered damages as a result of the misrepresentation.

## V. CONCLUSION

For the reasons stated above, the court GRANTS IN PART and DENIES IN PART BancTec's motion for summary judgment. The court GRANTS summary judgment for BancTec on Mr. Mobley's breach of contract claims, which are hereby DISMISSED WITH PREJUDICE. The court DENIES summary judgment for Mr. Mobley's fraud claim to the extent it is based on BancTec's misrepresentations of the RC360 technology and on the misrepresentations regarding the RC360 service's client base. The court finds, however, that to succeed on a fraud claim for BancTec's representation that Mr. Mobley would "own the P&L," he would have to prove

22

promissory estoppel, which he has failed to do. Accordingly, the fraud claim is DISMISSED

WITH PREJUDICE to the extent that it is based on the representation that Mr. Mobley would

"own the P&L." The court's holdings on these issues were pronounced in its prior order issued

on November 17, 2011 (doc. 26).

DONE and ORDERED this 8th day of December, 2011.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE